**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**


**GREGORY A. LEWIS,**

        **Plaintiff,**

**v.**                                        **Civil Action No. 2:04cv247**

**CITY OF VIRGINIA BEACH**
**SHERIFF'S OFFICE,**

        **Defendant.**


## OPINION AND ORDER


Plaintiff Gregory A. Lewis voluntarily resigned as a deputy sheriff with the Sheriff's Office of the City of Virginia Beach, Virginia (the "Sheriff's Office").  He subsequently filed this action pro se alleging, among other things, that the Sheriff's Office retaliated against him for filing a discrimination complaint and subjected him to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.  The matter is now before the Court on defendant's Motion for Summary Judgment.  (Docket No. 20.)  For the reasons stated below, the Court **GRANTS** the Motion for Summary Judgment.

## I.   Factual and Procedural History[1]

In January 1998, the Sheriff's Office hired Lewis and
appointed him to the rank of Deputy.  The Sheriff's Office
assigned Lewis to work in the City of Virginia Beach Correctional
Center (the "jail") as a Jail Officer.  Approximately one year
later, Lewis was transferred, at his request, to work in the
Civil Process Division of the Sheriff's Office.  Within three
years of beginning his employment with the Sheriff's Office,
Lewis received a promotion to the rank of Master Deputy II
(MDII), and he was reassigned to the jail for further training.
The following year, Lewis was again transferred, at his request,
to the Classification Division of the Sheriff's Office.  Lewis
remained in the Classification Division until he voluntarily
resigned his employment with the Sheriff's Office in May 2003.

In October 2002, Sergeant David N. Harris, who served as
Lewis' immediate supervisor, and Lieutenant Linda Richie, who
served as Sergeant Harris' supervisor, recommended Lewis for a
part-time position with the City of Virginia Beach Drug Court
(the "Drug Court").  Lewis' duties with the Drug Court were in
addition to his customary responsibilities in the Sheriff's

---

[1]In deciding the Motion for Summary Judgment, the Court must
view the facts, and the inferences reasonably drawn from those
facts, in the light most favorable to Lewis.  See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Smith
v. Cont'l Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004); Nguyen v.
CNA Corp., 44 F.3d 234, 237 (4th Cir. 1995).

Office, and he was paid overtime wages for his work in the Drug Court. Lewis served in the Drug Court through the end of the year. Lewis received a score of "Exceeds Standards" in every area of his performance evaluation for the year 2002.

In January 2003, Lewis and a few other deputy sheriffs were present when Sergeant Harris and Deputy J.R. Gibbs discussed a planned hunting trip. During the conversation, Sergeant Harris and Deputy Gibbs described the proper method to hunt bobcat and fox. They stated that these animals are hunted in complete darkness. An audio recording of a wounded animal's cry is used to lure the game toward the hunters. As the game approaches, the hunters use a red spotlight to illuminate the animal's eyes. The hunters aim their rifles at the glowing eyes and shoot.

During this conversation, Lewis asked Sergeant Harris and Deputy Gibbs if he could join them on their upcoming hunting trip. Sergeant Harris responded, "Yeah, sure you can, do your eyes glow in the dark?" Deputy Gibbs added that he had a fur coat that Lewis could borrow and wear so that Lewis could be "mistaken for game."[2] At the time, Lewis took no action in response to these comments.

One month later, in February 2003, Lieutenant Richie and

_____

[2]During an internal investigation conducted by the Sheriff's Office, Deputy Gibbs explained that he was merely "joking" when he suggested that Lewis wear a fur coat. Deputy Gibbs further stated that "no one appeared offended" during the conversation and that everyone left together later in the shift "laughing and joking." Lewis did not file a complaint concerning Deputy Gibbs' comment, and he has not complained about Deputy Gibbs' comment before this Court.

Sergeant Harris recommended that Lewis become the new entry-level supervisor in charge of the Pretrial/Work Release Office in the Classification Division.  Lewis served in this position throughout the remainder of his employment.

Approximately two months after the hunting trip discussion, Sergeant Harris subjected Lewis to a "written counseling" as discipline for various violations of standard operating procedures at the Sheriff's Office.  Sergeant Harris admonished Lewis for his failure to timely comply with Sergeant Harris' directive to provide a typed job description of his current assignment and for his failure to request an extension to complete the task.  Sergeant Harris also counseled Lewis for taking leave from work on two occasions without first contacting a supervisor and obtaining permission for the leave through the proper chain of command.  In addition to the "written counseling," Lewis received "verbal counseling" from Lieutenant Richie and Sergeant Harris concerning the above incidents.

One week after receiving the "written counseling" described above, Lewis submitted a complaint to the Equal Employment Opportunity (EEO) Coordinator of the Sheriff's Office.  He accused Sergeant Harris of engaging in "discriminatory action" when Sergeant Harris made the comment about Lewis' eyes glowing in the dark.  In his complaint, Lewis stated that he waited "so long to respond to this very serious discrimination (sic) act" because he really enjoyed his position in the Classification Division, and he was concerned that he "would be put on the black

4

list and never considered for a position again."

The following day, Chief Deputy Richard T. Schoonover met with Lewis and the EEO Coordinator and advised Lewis that the Professional Standards Office would investigate Lewis' complaint. When Lewis voiced concerns about possible retaliation, Chief Deputy Schoonover advised him that the Sheriff's Office "would not tolerate retaliation of any kind" and that Lewis should report any actions he believed to be retaliatory to either the EEO Coordinator or to Chief Deputy Schoonover.

The following week, Lewis informed Lieutenant Richie that Deputy James Slee had been disrespectful to him.  According to Lewis, he was in the courtroom as part of his Pretrial Services duties.  When he asked Deputy Slee to hand certain paperwork to the judge, Deputy Slee replied, "I didn't know your legs were broken."  (Lewis Dep. 45.)  Although Deputy Slee later apologized, Lewis regarded his apology as insincere.  Lewis sought Lieutenant Richie's advice on whether he should submit a Personal Conduct Report against Deputy Slee.

Lieutenant Richie advised Lewis that she would work within Deputy Slee's chain of command by speaking to Deputy Slee's supervisor (who later admonished Deputy Slee through a "verbal counseling").  Without notifying Lieutenant Richie, Lewis decided to submit a written report against Deputy Slee.  As a result, Deputy Slee received a "verbal counseling" and a Personal Conduct Report for the same incident.

Following the Deputy Slee incident, Lieutenant Richie sent a

detailed memorandum on March 25, 2003 to Captain Dave Van Nice outlining her concerns about Lewis' "inability to function within the chain of command," his "demonstrated . . . lack of concern to effectively deal with others," and his "improper leadership tactics."  Lieutenant Richie informed Captain Van Nice of Lewis' "written counselings" for his failure to obtain approval prior to taking leave from work and for his failure to timely complete an assigned task.  She also informed him of the incident involving Deputy Slee.

Lieutenant Richie further advised Captain Van Nice that during Lewis' service on the Drug Court, Lewis "began arriving to work a few minutes late."  According to Lieutenant Richie, Lewis became angry when Sergeant Harris admonished him for being tardy and he received a "written counseling" for his belligerence. Lieutenant Richie stated that Lewis' "daily job assignments were changed and the number of personnel he was assigned to supervise was reduced" in an attempt to develop him into "a more effective supervisor."

As recounted in the March 25 memorandum, Lewis' work performance had improved between November 2002 and January 2003. Lieutenant Richie stated that although Lewis' "productivity remained questionable," he took more of a "proactive" role in the Classification Division's decision-making process.  When Lewis was made the new entry-level supervisor in charge of the Pretrial/Work Release Office, Lieutenant Richie thought that it would have been an "excellent" opportunity for Lewis to "assume

more of a leadership role while increasing his autonomy."

Lieutenant Richie concluded her March 25 memorandum by stating that it was in Lewis' best interest to transfer him to another division of the Sheriff's Office.  Lieutenant Richie explained:

> Although none of these single incidents are of a
> serious nature, combined they demonstrate a pattern of
> conduct less than that expected of a supervisor.  I
> have made every attempt available as a leader to
> develop and encourage MDII Lewis to become a more
> productive supervisor.  I must be able to place
> complete trust and confidence in my supervisors . . . .
> MDII Lewis has violated my trust and has failed to
> demonstrate his ability to function within this chain
> of command.  I [feel] that the best opportunity for
> MDII Lewis to reach his full potential is to transfer
> him to a position where he is able to work side by side
> with his peers to learn the intricacies of being a team
> player as well as a supervisor.

At the time Lieutenant Richie sent this memorandum, she was not aware that Lewis had made a written complaint against Sergeant Harris for discrimination.  (Richie Affidavit ¶¶ 10, 12.)

After receiving a report of an internal investigation into Lewis' complaint against Sergeant Harris, Chief Deputy Schoonover classified Lewis' allegation as "INCONCLUSIVE."  Nonetheless, Sergeant Harris was removed from Lewis' chain of command on March 31, 2003, and Lieutenant Richie was made Lewis' immediate supervisor.  Both Sergeant Harris and Deputy Gibbs received "written counselings" admonishing them to be sensitive to others, to avoid offensive comments, and to maintain attitudes of professionalism at all times in the workplace.

One week after Sergeant Harris was removed from Lewis' chain

of command, Lewis, at his request, met with Sheriff Paul Lanteigne and Chief Deputy Mark G. Mustin.  According to Lewis, he advised Sheriff Lanteigne and Chief Deputy Mustin of his concern that Lieutenant Richie was retaliating against him for making his complaint against Sergeant Harris.[3]  Lewis declined Chief Deputy Mustin's offer to transfer Lewis out of the Classification Division.

A few days later, Lieutenant Richie filed a Personal Conduct Report against Lewis for an April 9, 2003 incident involving Brian Denicourt, an inmate in the Work Release Program.  That morning, the inmate reported to his employer for work at a construction site.  After the employer informed the inmate that his services would not be needed that day due to inclement weather, the inmate failed to notify the Sheriff's Office and simply went to a friend's house.  The inmate did not report back to the jail until later that evening.  For over eight hours, the inmate's whereabouts were unknown to the Sheriff's Office.

At approximately 9:00 a.m. on the morning of April 9, Lewis was notified by his subordinates that the inmate was not at his place of employment and that he could not be located.  In

---

[3]Both Sheriff Lanteigne and Chief Deputy Mustin deny that Lewis mentioned any concern about possible retaliation from Lieutenant Richie, and maintain that they merely discussed the investigation into Lewis' complaint against Sergeant Harris and the response of the Sheriff's Office.  (Lanteigne Affidavit ¶¶ 3-5; Mustin Affidavit ¶¶ 3-5.)  They both claim that Lewis did not report his allegations against Lieutenant Richie prior to the Sheriff's Office's receipt of his Notice of Charge from the Equal Employment Opportunity Commission.  (Lanteigne Affidavit ¶ 3; Mustin Affidavit ¶ 3.)

response, Lewis merely instructed his subordinates in the Work Release Program "to take the same actions they had taken the last time this situation arose."  However, Lewis failed to notify a supervisor, the Watch Commander, or the Emergency Response Team that the inmate could not be located.  These failures to notify were a direct violation of the standard operating procedures of the Sheriff's Office.  Lewis also failed to have the inmate subjected to a urine test upon his return to the jail.

Lieutenant Richie informed Lewis that she had submitted to Chief Deputy Mustin a Personal Conduct Report concerning Lewis' failures in the Denicourt Work Release incident.  She also informed Lewis that Chief Deputy Mustin had decided to transfer Lewis out of the Classification Division "on the next movement order."

On May 15, 2003, Lewis filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  On that same date, Chief Deputy Schoonover submitted a "Final Review" of the Personal Conduct Report and concluded that Lewis' job performance was "unsatisfactory" when Lewis "failed to take proper action when it was reported to him that a work release inmate was not at his place of employment."  Chief Deputy Schoonover's Report was to serve as a documentation for a "counseling" of Lewis. However, as described below, Lewis resigned his employment before Lieutenant Richie had the opportunity to counsel him with the Report.

Lewis was also involved in another incident in the Work

Release/Electronic Home Monitoring (EHM) section of the
Classification Division.[4]  An inmate, former boxing champion
Pernell "Sweetpea" Whitaker, was improperly placed in the EHM
Program in direct violation of a court order.  Chief Deputy
Schoonover concluded that Lewis had "failed to supervise a
subordinate who improperly enrolled [the] inmate in the EHM
Program."  Lewis had explained to Chief Deputy Mustin that "he
failed to review the documentation on the EHM placement of an
inmate" because "he was never told" that he was responsible for
the EHM section.

    Following these incidents, Chief Deputy Schoonover and Chief
Deputy Mustin directed that Lewis be reassigned to the jail
effective June 1, 2003.  Chief Deputy Mustin decided to transfer
Lewis from his position as the Pretrial Services/Work Release
supervisor after learning that Lewis had "fail[ed] to act in
locating and returning a work release inmate who had not reported
to his work assignment."  (Mustin Affidavit ¶ 7.)  Although the
transfer did not affect Lewis's job status, rank, wages, and
benefits, he perceived the transfer to be a demotion.  (Lewis
Dep. 22.)

    On May 20, 2003, Captain Van Nice sent a memorandum to Chief
Deputy Mustin recommending that Lewis be demoted to the rank of
Deputy.  Captain Van Nice, citing in particular the EHM incident
involving inmate Whitaker, concluded that "Lewis has shirked his

---

    [4]It is unclear in the record whether this incident occurred
in April or May 2003.

responsibilities [as] a supervisor and has been unwilling to accept constructive criticism with any kind of grace."  Captain Van Nice further stated, "I don't believe [Lewis] knows the first thing about leadership and he seems unwilling to learn the skill."  Captain Van Nice also stated his opinion that Lewis was "untrainable and uncoachable" and that he had "been given more opportunities to fit in and develop his leadership skills than anyone else" that Captain Van Nice could recall.

The following day, May 21, 2003, Chief Deputy Mustin advised Chief Deputy Schoonover via memorandum that he concurred with Captain Van Nice's recommendation to demote Lewis to the rank of Deputy.  Citing the Whitaker EHM incident and the Denicourt Work Release incident, Chief Deputy Mustin concluded that "Lewis has failed to perform in the manner expected of a supervisor in the Virginia Beach Sheriff's Office."  Lewis was not informed of the recommendations of Chief Deputy Mustin and Captain Van Nice to demote him.

On May 28, 2003, Lewis submitted his letter of resignation to the Sheriff's Office, effective May 30, 2003.  Lewis resigned his employment before any action was taken or any decision was made concerning the recommendations to demote him.

After receiving a Right to Sue Letter from the EEOC, Lewis filed the instant action.  (Docket No. 1.)  Lewis alleges in his Complaint that the Sheriff's Office discriminated against him on the basis of his race and retaliated against him for his opposition to an unlawful employment practice, in violation of

11

Title VII of the Civil Rights Act.[5]  Specifically, Lewis claims that Lieutenant Richie "started to harass, retaliate, and create a hostile work environment" for Lewis after he filed his EEO complaint against Sergeant Harris.  Lewis seeks, among other things, $5,000,000 in damages.

## II.  Principles of Summary Judgment

The standards courts apply in their consideration of motions for summary judgment are well-established.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004); Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 449 (4th Cir. 2004).

An otherwise proper summary judgment motion will not be defeated by a mere factual dispute between the parties unless the dispute concerns a "genuine issue of material fact."  Anderson,

---

[5]Lewis' claims for defamation under Va. Code § 18.2-209 and for violation of the Virginia Human Rights Act, Va. Code §§ 2.2-2639 and -3900, were dismissed by previous Order of this Court. (Docket No. 14.)

477 U.S. at 247-48; Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003).  A "material fact" is a fact that might affect the outcome of a party's case.  See Anderson, 477 U.S. at 248; JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001); Commerce Funding Corp. v. Worldwide Sec. Servs. Corp., 249 F.3d 204, 209 (4th Cir. 2001).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; see also Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 248; Commerce Funding Corp., 249 F.3d at 209-10; Brinkley v. Harbour Recreation Club, 180 F.3d 598, 614 (4th Cir. 1999).

Summary judgment shall be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322; see also Hooven-Lewis, 249 F.3d at 265; Johnson v. Pearson, 316 F. Supp. 2d 307, 313 (E.D. Va. 2004).  The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law.  Honor

13

v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004); McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718 (4th Cir. 2003); see Celotex Corp., 477 U.S. at 322-25.  When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Honor, 383 F.3d at 185; McLean, 332 F.3d at 718-19.

In meeting this burden, the nonmoving party must "go beyond the pleadings" and present affidavits or designate specific facts in depositions, answers to interrogatories, and admissions on file to establish a genuine issue of material fact.  Celotex Corp., 477 U.S. at 324; see also M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1993); Parker v. Westat, Inc., 301 F. Supp. 2d 537, 540 (E.D. Va. 2004).  However, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact.  See Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 586; Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002); Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir. 1997); Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc., 330 F. Supp. 2d 668,

671 (E.D. Va. 2004).  The evidence presented must be such that a reasonable jury could find in favor of the nonmoving party. Anderson, 477 U.S. at 252; Retail Servs. Inc. v. Freebies Publ'q, 364 F.3d 535, 542 (4th Cir. 2004); Tao of Sys. Integration, Inc., 330 F. Supp. 2d at 671.

Summary judgment is not a "disfavored procedural shortcut." Celotex Corp., 477 U.S. at 327; Sibley v. Lutheran Hosp. of Md., Inc., 871 F.2d 479, 483 n.9 (4th Cir. 1989); Brown v. Mitchell, 327 F. Supp. 2d 615, 628 (E.D. Va. 2004).  Rather, the summary judgment procedure is properly regarded as an "integral part" of the Federal Rules of Civil Procedure, which are designed to obtain a just, expeditious, and inexpensive resolution of every civil matter.  Celotex Corp., 477 U.S. at 327; Sibley, 871 F.2d at 483 n.9; Graham v. Pactiv Corp. Benefits Comm., 301 F. Supp. 2d 483, 491-92 (E.D. Va. 2004).

A court "must take special care" when considering a summary judgment motion in an employment discrimination case because the employer's "motive is often the critical issue." Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996); Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).  Nevertheless, summary judgment remains an appropriate disposition when the plaintiff is unable to prevail on his or her discrimination claims as a matter of law.  Beall, 130 F.3d at 619; Evans, 80 F.3d at 958-59.

15

### III.  Analysis

A plaintiff proceeding under Title VII of the Civil Rights Act of 1964 may prove his case in one of two ways.  See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004); Equal Employment Opportunity Comm'n v. Clay Printing Co., 955 F.2d 936, 940 (4th Cir. 1992); Goldberg v. B. Green & Co., 836 F.2d 845, 847-48 (4th Cir. 1988).  First, he or she may establish a claim for discrimination "under the ordinary standards of proof by direct or indirect evidence relevant to and sufficiently probative of the issue."  Clay Printing Co., 955 F.2d at 940; see also Diamond, 416 F.3d at 318; Hill, 354 F.3d at 284; Goldberg, 836 F.2d at 847.  Alternatively, he or she may proceed under the burden-shifting framework established by the United States Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).  See Diamond, 416 F.3d at 318; Hill, 354 F.3d at 285; Clay Printing Co., 955 F.2d at 940; Goldberg, 836 F.2d at 847.

Because Lewis has not presented evidence of discriminatory intent, the Court will examine his claims of discrimination using the McDonnell Douglas burden-shifting framework.  See Hill, 354 F.3d at 284-85; Thompson, 312 F.3d at 649; Brinkley, 180 F.3d at 606-07; El v. Tek Sys., Inc., 311 F. Supp. 2d 516, 519 (E.D. Va. 2002); Wilder v. Southeastern Pub. Serv. Auth., 869 F. Supp. 409, 413 (E.D. Va. 1994).

Under the McDonnell Douglas framework, a plaintiff asserting a claim under Title VII has the initial burden to prove a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas Corp., 411 U.S. at 802; see also Raytheon Co. v. Hernandez, 540 U.S. 44, 50 (2003); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Mackey v. Shalala, 360 F.3d 463, 468 (4th Cir. 2004).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the defendant's employment action. McDonnell Douglas Corp., 411 U.S. at 802; see also Raytheon Co., 540 U.S. at 50; St. Mary's Honor Ctr., 509 U.S. at 506-07; Mackey, 360 F.3d at 468.  If the defendant meets this burden, then "the presumption raised by the prima facie case is rebutted" and the presumption "drops from the case."  St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 and n.10 (1981)); see also Mackey, 360 F.3d at 468.  The plaintiff then must have a "full and fair opportunity" to demonstrate, through the presentation of its own evidence and the cross-examination of the defendant's witnesses, that the defendant's proffered reason for its employment decision was not the true reason, but was merely a pretext for discrimination.  St. Mary's Honor Ctr., 509 U.S. at 507-08; Burdine, 450 U.S. at 253, 255-56; Hill, 354 F.3d at 285; see Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 (4th Cir. 2002). Although the McDonnell Douglas framework shifts the burden of

17

production between the parties, the plaintiff retains the "ultimate burden" of persuasion.  St. Mary's Honor Ctr., 509 U.S. at 508; Burdine, 450 U.S. at 253; see Hill, 354 F.3d at 285.

A.  Retaliation

To establish his prima facie case of retaliation, Lewis must prove that: (i) he engaged in a protected activity; (ii) he suffered an "adverse employment action"; and (iii) a causal connection existed between the protected activity and the asserted adverse action.  See Honor, 383 F.3d at 188; Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004); King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir. 2003); Giang v. Potter, 369 F. Supp. 2d 763, 769 (E.D. Va. 2005).

To establish the existence of the second element, i.e., "adverse employment action," Lewis must prove that the Sheriff's Office committed a discriminatory act that adversely affected the terms, conditions, or benefits of his employment.  See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004); Thompson, 312 F.3d at 650-51; Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001).  Lewis' claim for retaliation fails because there is no evidence in the record that he suffered any adverse effect on the terms, conditions, or benefits of his employment.  The principal retaliatory act that Lewis identifies is his planned transfer from the Classification Division to the jail.  While Lewis may subjectively view this as a demotion, the

transfer would have no impact on Lewis' rank, salary, or employment benefits.  Moreover, reassignments and transfers are a routine part of the normal operations of the Sheriff's Office. Lewis was transferred several times throughout his employment to various divisions of the Sheriff's Office, including the jail. For example, when Lewis was first promoted to the rank of Master Deputy II, he was immediately reassigned to the jail.

"The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." James, 368 F.3d at 376; see also Peary v. Goss, 365 F. Supp. 2d 713, 722 (E.D. Va. 2005).  Reassignment to a different job position cannot form the basis for a valid Title VII claim if the plaintiff cannot show that the reassignment had "some significant detrimental effect." James, 368 F.3d at 376; Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999); Peary, 365 F. Supp. 2d at 722.  "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Boone, 178 F.3d at 256-57; see also James, 368 F.3d at 376; Peary, 365 F. Supp. 2d at 722-23.  "Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment." Boone, 178 F.3d at 256.

Nor may Lewis establish an "adverse employment action" by relying on Captain Van Nice's and Chief Deputy Mustin's

recommendations to demote Lewis in rank.  Lewis was not informed of the recommendations to demote him, and he voluntarily resigned from the Sheriff's Office before any action was taken concerning the recommendations.  Moreover, there is no evidence that the recommendations necessarily would have been followed.  It is entirely possible that Lewis would have received only a "counseling" or some other form of admonishment once the Sheriff's Office further investigated the matter.[6]

Even if Lewis had established an adverse employment action, his claim would still fail because Lewis is unable to show the third element of his prima facie case, i.e., a causal connection between the protected activity and the alleged adverse action. In order to establish the requisite causal connection, a plaintiff must, at a minimum, show that the relevant decisionmaker was aware that the plaintiff had engaged in a protected activity.  Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 655 (4th Cir. 1998); see Hooven-Lewis, 249 F.3d at 277-78; Gibson v. Old Town Trolley Tours of Wash., D.C., Inc., 160 F.3d 177, 181 (4th Cir. 1998).  Since "an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the

---

[6]Lewis also complains that Lieutenant Richie retaliated against him by denying him permission to attend a seminar.  Even if true, this decision did not affect the terms, benefits, or conditions of Lewis' employment.  Accordingly, the incident does not constitute an "adverse employment action" for purposes of the present proceedings.

plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."  <u>Dowe</u>, 145 F.3d at 657.

Lieutenant Richie averred that she first learned that someone had filed a complaint against Sergeant Harris during the second half of March 2003 when investigators from the Professional Standards Division interviewed other personnel in the Classification Division as part of their investigation into the complaint.  (Richie Affidavit ¶ 3.)  According to Lieutenant Richie, she did not know of the complaint when she sent Captain Van Nice the March 25, 2003 memorandum recommending that Lewis be transferred to the jail.  (Richie Affidavit ¶¶ 10-12.) Lieutenant Richie averred that her recommendation was based solely on Lewis' "conduct and inability to function within the chain of command in the Classification Division."  (Richie Affidavit ¶ 12.)

Lieutenant Richie did not learn that it was Lewis who had filed the complaint against Sergeant Harris until Sergeant Harris was removed from Lewis' chain of command on March 31, 2003. (Richie Affidavit ¶ 4.)  Lieutenant Richie first learned of the substance of Lewis' complaint only after Lewis filed his EEOC Charge on May 15, 2003.  (Richie Affidavit ¶ 5.)

Lewis testified repeatedly in deposition that he did not know whether Lieutenant Richie actually knew of his complaint against Sergeant Harris.  (Lewis Dep. 32-34.)  Lewis further testified that he merely assumed that Lieutenant Richie was aware

of the complaint.  (Lewis Dep. 34-35.)  During oral argument
before this Court, Lewis conceded that, other than the mere
"sequence of events," he did not have any evidence that
Lieutenant Richie knew of his complaint at the time of her
alleged retaliatory action.

Accordingly, the record is "utterly devoid of evidence" that
Lieutenant Richie "harbored any retaliatory intent" toward Lewis
or that she even knew of Lewis' complaint against Sergeant Harris
until <u>after</u> she had made the recommendation to transfer Lewis.
<u>See Gibson</u>, 160 F.3d at 181.  In order for the Court to "find
causation on the basis of this bare-boned evidence," the Court
would need to "move beyond inference and into the realm of mere
speculation and conjecture."  <u>See id.</u> (internal quotations
omitted).  The Court declines to take such a journey.


B.  Employment Discrimination


Lewis' written submissions and his oral argument to this
Court suggest that the focus of his Complaint is retaliation
prohibited by Title VII.  Lewis does not expressly claim that the
Sheriff's Office discriminated against him on the basis of his
race.  (Docket No. 1.)  However, the Court recognizes that Lewis,
as a <u>pro</u> <u>se</u> litigant, is to be treated with deference.  <u>See</u>
<u>Ballard v. Carlson</u>, 882 F.2d 93, 96 (4th Cir. 1989); <u>Taylor v.</u>
<u>Wal-Mart Stores, Inc.</u>, 376 F. Supp. 2d 653, 655 (E.D. Va. 2005).
As such, Lewis' Complaint is to be liberally construed.  <u>See Hill</u>

v. Braxton, 277 F.3d 701, 707 (4th Cir. 2002); Noble v. Barnett, 24 F.3d 582, 587 n.6 (4th Cir. 1994); Johnson, 316 F. Supp. 2d at 313; Levy v. Jensen, 285 F. Supp. 2d 710, 713 (E.D. Va. 2003). The Court therefore will construe Lewis' Complaint as having raised a claim for employment discrimination under Title VII.[7]

To establish his prima facie case of employment discrimination based on race, Lewis must prove that: (i) he is a member of a protected class; (ii) he suffered an "adverse employment action"; and (iii) at the time of the "adverse employment action," his job performance met his employer's legitimate expectations.[8]  See St. Mary's Honor Ctr., 509 U.S. at

---

[7]The liberal construction applied to a pro se complaint has its limits.  Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); Johnson, 316 F. Supp. 2d at 313-14; Bracey v. Buchanan, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999).  The Court is not required to "conjure up questions never squarely presented" in the complaint.  Beaudett, 775 F.2d at 1278; see also Levy, 285 F. Supp. 2d at 713; Bracey, 55 F. Supp. 2d at 421.  "District judges are not mind readers.  Even in the case of pro se litigants, they cannot be expected to construct full blown claims from sentence fragments."  Beaudett, 775 F.2d at 1278; see also Johnson, 316 F. Supp. 2d at 313-14; Bracey, 55 F. Supp. 2d at 421.

[8]A prima facie case for racial discrimination traditionally includes a fourth factor:  whether the plaintiff's job position remained open to, or was filled by, similarly qualified applicants outside of the plaintiff's protected class.  See St. Mary's Honor Ctr., 509 U.S. at 506; Hill, 354 F.3d at 285; Brinkley, 180 F.3d at 607; Wilder, 869 F. Supp. at 413 n.1. However, the proof required for a plaintiff to establish a prima facie case will vary depending on the facts of each case. McDonnell Douglas Corp., 411 U.S. at 802 n.13.  As such, "the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations."  Id.  Because Lewis voluntarily resigned his employment with the Sheriff's Office, the Court need not consider this fourth factor in the present case.  See Wilder, 869 F. Supp.

506; <u>Hill</u>, 354 F.3d at 285; <u>Brinkley</u>, 180 F.3d at 607; <u>see also</u> <u>Wilder</u>, 869 F. Supp. at 413.  For the reasons stated above in the analysis of Lewis' retaliation claim, Lewis cannot prove that he suffered any legally cognizable "adverse employment action."

## C.  Hostile Work Environment

As with the employment discrimination claim, it is unclear whether Lewis is making a separate and distinct claim for a hostile work environment.  However, in light of the deference given to <u>pro se</u> litigants, <u>see</u> <u>Ballard</u>, 882 F.2d at 96; <u>Taylor</u>, 376 F. Supp. 2d at 655, and the liberal construction afforded to their pleadings, <u>see</u> <u>Hill</u>, 277 F.3d at 707; <u>Noble</u>, 24 F.3d at 587 n.6; <u>Johnson</u>, 316 F. Supp. 2d at 313; <u>Levy</u>, 285 F. Supp. 2d at 713, the Court will construe Lewis' Complaint to raise such a claim.

To establish his claim for a racially hostile work environment, Lewis must show that he was subjected to conduct that was:  (i) unwelcome; (ii) based on race; and, (iii) sufficiently pervasive or severe to alter the conditions of his employment and create an abusive atmosphere.  <u>See</u> <u>Honor</u>, 383 F.3d at 190; <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 296-97 (4th Cir. 2004); <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 183 (4th Cir. 2001).  Further, Lewis must also prove that "there is some

at 413 n.1.

basis for imposing liability" on the Sheriff's Office.  See
Honor, 383 F.3d at 190; White, 375 F.3d at 297; Spriggs, 242 F.3d
at 184.

The determination whether a hostile work environment has
been created includes both objective and subjective components.
Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir. 2002); see
Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  The work
environment must be such that a reasonable person would find it
hostile or abusive, and the plaintiff must also "subjectively
perceive the environment to be abusive."  Harris, 510 U.S. at 21;
see also Equal Employment Opportunity Comm'n v. R&R Ventures, 244
F.3d 334, 339 (4th Cir. 2001).  "In assessing whether a work
environment is objectively hostile, a court must consider 'all
the circumstances,' including 'the frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance.'"  Anderson, 281 F.3d at 459 (quoting Harris, 510
U.S. at 23); see also R&R Ventures, 244 F.3d at 339.

Lewis cannot successfully assert a racially hostile work
environment claim based solely on Sergeant Harris' comments
concerning Lewis' eyes "glowing" in the dark.  "[M]erely
offensive" conduct and "isolated incidents" do not serve to
create a hostile work environment.  See Clark County Sch. Dist.
v. Breeden, 532 U.S. 268, 271 (2001); Harris, 510 U.S. at 21;
Brinkley, 180 F.3d at 608.  "Title VII was not designed to create

25

a federal remedy for all offensive language and conduct in the workplace." <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 754 (4th Cir. 1996); <u>see</u> <u>also</u> <u>Brinkley</u>, 180 F.3d at 608.

Lewis' complaints about being transferred laterally and being disciplined for workplace infractions also do not rise to the level of a hostile work environment.  Moreover, there is no evidence that the alleged conduct of which Lewis complains was based on Lewis' membership in a protected class.  Accordingly, the Sheriff's Office is entitled to summary judgment on Lewis' hostile work environment claim.

## IV.  Conclusion

For the reasons stated above, the Motion for Summary Judgment of the Sheriff's Office is **GRANTED.**

The Clerk is hereby **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

$$\underline{\hspace{2cm} /s/ \hspace{2cm}}$$
Walter D. Kelley, Jr.
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 17, 2006